# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>)<br>)<br>JOSEPH JENKINS, a/k/a JOSEPH )<br>WHITE, a/k/a JOSEPH CRUZ, )<br>a/k/a CHRISTOPHER BUNCH, )<br>)<br>Defendant ) | Criminal No. 10-85-P-H |

## RECOMMENDED DECISION ON MOTION TO SUPPRESS

Joseph Jenkins, charged with being a felon in possession of a firearm (a Smith and Wesson Model 459 9mm pistol) in violation of 18 U.S.C. §§ 922(g)(1) and 924(a), *see* Indictment (Docket No. 15), seeks to suppress evidence gathered as a result of an assertedly illegal stop and arrest in Bowdoinham, Maine, on March 18, 2010, followed by an assertedly illegal vehicle search pursuant to a warrant later that day, *see* Motion To Suppress Evidence ("Motion To Suppress") (Docket No. 22).

An evidentiary hearing was held before me on August 5, 2010, at which the defendant appeared with counsel. The government tendered one witness and offered four exhibits, which were admitted without objection. The defendant offered seven exhibits, which were admitted without objection. After both sides rested, counsel for each argued orally. I now recommend that the following findings of fact be adopted and that the Motion To Suppress be denied.

1

## I. Proposed Findings of Fact

At about 11 a.m. on March 18, 2010, Maine State Trooper Robert Cejka was walking back to his cruiser, facing oncoming northbound traffic, after completing a vehicle stop on the right-hand-side breakdown lane of Interstate 295 ("I-295") in Bowdoinham, Maine, when he observed what he thought was a blue light mounted on the windshield of a green minivan traveling northbound in the passing lane. It was a bright, sunny day. Cejka, who was patrolling the stretch of I-295 between Brunswick and Gardiner, Maine, was accompanied that day by his daughter, a junior at Smith College who was home on spring break and had an interest in entering the criminal justice field.[1]

Cejka got into his cruiser, which still had blue lights activated, and told his daughter that he had to stop the driver of the minivan that had just passed him because he thought the driver was displaying a blue light. He understood it to be a violation of Maine law, albeit a civil infraction and not an arrestable offense, to mount a blue light in a vehicle. He had stopped at least one vehicle previously for that traffic infraction.

Cejka pulled onto the highway and caught up to the minivan, pulled directly behind it, and activated his siren. The minivan traveled an additional 39 seconds, covering about a half a mile, before pulling over to the side of the highway. During that time, Cejka observed the driver,

---

[1] When Cejka was asked on direct examination whether he rides alone or with a partner, he testified that he rides alone but that, on the day in question, he was accompanied by a "ride-along," a college student who was a junior at Smith College who was there to observe and learn and had an interest in a possible career in the criminal justice system. On cross-examination, defense counsel established that the "ride-along" happened to be Cejka's daughter. Defense counsel suggested that Cejka misled the court in omitting to disclose on direct examination that the student was in fact his daughter. Cejka denied any intention to mislead anyone, stating that troopers often have college students ride with them, and that his daughter accompanied him that day in her role as an interested student rather than as his daughter. On redirect examination, Cejka also testified that he was informed, after the defendant had been jailed, that the defendant had stated in a phone call made from jail that he wished that he had shot Cejka and the girl who was with him. In the circumstances, I do not view Cejka's reluctance to volunteer that his passenger was his daughter as bearing negatively on his credibility. He understandably did not wish to testify as to her identity unless directly asked. When he was directly asked, he testified truthfully. I found him to be a credible witness.

whom he identified in court as the defendant, make numerous movements to his right and right rear, during which time the vehicle weaved to the left, and tap his brake lights, before coming to an abrupt halt in the right-hand-side breakdown lane. This was unusual: in Cejka's experience, drivers typically stop within five to 10 seconds after he activates his flashing blue lights and siren.

The defendant's movements in the minivan, coupled with the length of time it took for him to pull over, caused Cejka concern for his safety and that of his daughter. He told his daughter to watch out, exited his cruiser, and approached the passenger side of the minivan with his hand on his service weapon. He instructed the defendant to put both of his hands out of the window, and the defendant complied. He had issued such an instruction to a driver fewer than three times in his career as a state trooper, which had commenced in July 2007, following a five-month field training period.[2] Since becoming a state trooper, he had on average stopped approximately 200 vehicles, and written between 70 and 80 tickets, monthly.

As Cejka reached the driver's side of the minivan, he observed a movie playing on a television screen mounted on the dashboard. He understood it to be a violation of Maine law, albeit a civil infraction and not an arrestable offense, to watch a movie while operating a motor vehicle. He also observed a blue suction cup of a type used to mount a GPS device affixed to the windshield, and a blue handicapped placard hanging from the rearview mirror directly above. The back of the rearview mirror was a bright chrome, which Cejka supposed had glinted in the sunlight as he first sighted the minivan on I-295. There was no blue light.[3]

---

[2] Prior to becoming a state trooper, Cejka served for 20 years in the U.S. Army, retiring as a lieutenant colonel.
[3] At hearing, Cejka testified several times that he *believed* that he had seen a blue light in the van up until the point that he looked in and saw none. Defense counsel pointed out that, in the videotape of the stop, Cejka can be heard stating repeatedly that he *thought* he saw a blue light, which counsel asserted revealed Cejka's contemporaneous doubt that he had seen one. Regardless of whether Cejka believed or thought that he saw a blue light, it is clear that
*(continued on next page)*

The defendant was talking on a cell phone as Cejka approached. Cejka asked him what he was doing as Cejka had tried to pull him over. The defendant said that he had dropped his cell phone, found it, and called his wife to tell her that he was being pulled over by the police. As he explained that he had dropped his cell phone, he reached between his legs and pulled out a DVD remote control. Cejka understood him, in so doing, to be indicating that he had dropped the cell phone between his legs. Cejka did not judge the explanation consistent with the movements that he had observed.

Cejka asked the defendant for his driver's license and registration. He routinely asks for identification for purposes of issuing a ticket for traffic violations. The defendant said that he did not have them and had left them at home. As per his custom when this happens, Cejka asked for another form of identification. The defendant produced only a white postcard with the name White on it and a Standish, Maine, address. Cejka asked the defendant for his name, date of birth, and the last four digits of his Social Security number. The defendant gave his name as Joseph White and his date of birth as 1966, and supplied four digits.

During this initial encounter, Cejka observed that the defendant appeared nervous, and his hands were shaking. He told the defendant, "You seem nervous. Is there something I need to know?" He asked, for example, whether the defendant had a suspended license, outstanding warrants for his arrest, or was on probation. The defendant said no.

Cejka returned to his cruiser and ran the information provided by the defendant through a Maine Department of Motor Vehicles ("DMV") database in his cruiser computer. The search yielded no confirmation that a person with that identifying information possessed a valid Maine driver's license. Cejka had the capability to search for the presence of a valid driver's license

---

he suspected that the van had a blue light but was not certain that it did. As discussed below, I deem his suspicion to have been reasonable in the circumstances.

nationwide, but did not do so. Cejka returned to the minivan, again instructing the defendant to place both of his hands out of the window. The defendant again complied. Cejka informed the defendant that he had been unable to validate that he had a Maine driver's license. The defendant then told Cejka that he did not have a Maine driver's license and never had had one. Cejka asked him if he had ever had a driver's license in any state. The defendant responded, "Arizona." Cejka commented that he could search the Arizona database and pull up evidence of the license, then asked the defendant when he last had an Arizona license. The defendant replied that he had had a license when a minor. Cejka then directed him to exit the minivan and sit on its rear bumper. The defendant did so. Cejka returned to his cruiser, backed it up for the safety of himself and his daughter and, after consulting by phone with his sergeant, placed the defendant under arrest for operating a vehicle without a driver's license, a Class E crime. He then handcuffed the defendant.

Cejka's daughter moved to the back seat of the cruiser, and Cejka placed the defendant in the front seat and drove him to Two Bridges Jail in Wiscasset. At the jail, Cejka made an additional fruitless attempt to verify the defendant's identity based on information that the defendant had supplied regarding his parents' names and residence. Cejka asked jail personnel to hold the defendant while he left to apply for a warrant to search the minivan. He arranged to meet with Assistant District Attorney Patricia Mador at the Maine District Court in West Bath, Maine, and drafted a search warrant application with her help. While Cejka suspected that the minivan contained some kind of contraband, he did not know what kind of contraband it might be. At about 1:40 p.m., Cejka received a call from a Lieutenant Bailey at the jail, informing him that the defendant had identified himself as Joseph Jenkins and had supplied a different date of

5

birth, and that the jail had confirmed that there were outstanding felony warrants for the defendant's arrest in New Mexico and that his Maine driver's license had been suspended.

In his affidavit supporting the search warrant application, Cejka stated, *inter alia*:

> The mini-van failed to stop and the operator began to make numerous furtive movements inside the van by bending to his right and bending to his right rear. I then put on my siren and the van continued to drive without pulling over and the operator continuing to make the same furtive movements. The minivan traveled approximately ½ mile after I first initiated my lights. The minivan pulled over into the breakdown lane. Based on my training and experience, furtive movements indicate a person is attempting to hide or conceal items to prevent their discovery by law enforcement.

Affidavit and Request for Search Warrant ("Affidavit"), Gov't Exh. 3, ¶ 2. Cejka recounted in his affidavit that, after he was unable to verify the defendant's identity, and the defendant had refused to provide fingerprints when jailed, he learned from Bailey that the defendant had subsequently identified himself as Joseph Lee Jenkins, provided a different date of birth, and had said that he had outstanding felony warrants in New Mexico for kidnapping, conspiracy, and identity theft, which the Central Maine Regional Communications Center in Augusta confirmed as extraditable. *See id*. ¶¶ 6, 8-9. Cejka concluded:

> Based on my training and experience I have probable cause to believe the motor vehicle operated by WHITE contains some form of contraband. I observed the furtive movement for at least one-half mile while I was in pursuit of the vehicle. The vehicle did not stop for my blue lights nor my siren and continued to travel at 65 miles per hour. Based on my training and experience, the nature and extent of the furtive movement and his failure to stop, is indicative of an effort to hide or dispose of contraband or evidence of criminal conduct.

*Id*. ¶ 10.

Cejka presented his application to District Court Judge Joseph Field, who issued the requested warrant after meeting with Cejka. *See* Gov't Exh. 4. Cejka and two other Maine state troopers conducted a search of the minivan, retrieving a gun, switchblade, and another knife, and

6

taking photographs. Cejka was present when the gun, the subject of the instant indictment, was found.

Just prior to pulling over the defendant's minivan, Cejka had asked his daughter if she was bored. He had been explaining his decision criteria for writing a ticket *versus* issuing a warning, and she either had a look on her face indicative of boredom or had begun reading a book while he was talking. Cejka denied that his daughter's boredom was on his mind when he chose to pursue the defendant's minivan or that he otherwise manufactured any traffic stops to provide her entertainment.

Cejka suffered from dry eyes during the winter. On the day of the traffic stop in question, he was wearing new prescription sunglasses that he described as "wicked thick" to a fellow state trooper. He testified at hearing that the lenses are not so thick, but the outer frames are thick and rugged. He denied that he had any trouble with his eyes on the day in question.

A period of only about three seconds elapsed from the time that Cejka first observed the defendant's minivan in the distance to when it passed by him. At least twice during that time frame, Cejka looked back over his shoulder toward the vehicle that he had just stopped. He agreed that he had a view of what he thought was a blue light for only a fraction of a second as the minivan approached and passed him going at a speed of about 55 to 65 miles per hour. Cejka decided to pull the minivan over solely on the basis of the suspected blue light. He did not observe the defendant speeding or driving erratically and perceived no problem with the minivan's registration or inspection sticker.[4]

---

[4] On cross examination, defense counsel questioned whether Cejka was familiar with an exception in the "blue light" law permitting any vehicle to use interior blue auxiliary or dashboard lighting so long as the beam of light is at a height of not more than 42 inches and not visible more than 20 feet from the vehicle. Cejka stated that he was familiar with that exception. He admitted that he did not try to stand at a height of 42 inches, 20 feet from the vehicle, to determine if it had a beam of light in violation of the statute. However, he testified, there was no beam of light.

On the day in question, there was a large speaker box in the back of the minivan, taller than the back of the rear seat. The rear window of the minivan was at least lightly tinted. However, Cejka was able to see the defendant's arm disappear as he moved it in front of the front seat and see it silhouetted as he moved it in back of the front seat.

Although Cejka caught up with the defendant on the interstate and slowed down to drive at the same speed as he was, he did not try to confirm or dispel his suspicion that the minivan had a blue light by driving up alongside it and glancing into it. Cejka does not make a habit of pulling up alongside vehicles to glance over his shoulder into them. When he has done so, he has found that he has a tendency to slide toward the other vehicle. He further testified that, if he had done so in this case, he was not sure that he would have seen the GPS unit.

## II. Discussion

The defendant seeks to suppress all evidence seized as a result of the traffic stop, his arrest, and the search of his vehicle on March 18, 2010, arguing that (i) Cejka lacked reasonable and articulable suspicion to effectuate the stop, as required by *Terry v. Ohio*, 392 U.S. 1 (1968), (ii) Cejka lacked probable cause to place him under arrest for driving without a license, and (iii) the warrant to search the vehicle was unsupported by probable cause. *See* Motion To Suppress at [1]-[2]. He further argues that all evidence gathered subsequent to the initial stop and/or the arrest must be suppressed as the "fruit of the poisonous tree."[5] *See id.* at [2].

The government denies that the stop, the arrest, or the vehicle search were unlawful. *See* Government's Objection to Defendant's Motion to Suppress Evidence ("Objection") (Docket No. 24) at 5-10. It adds that, even assuming *arguendo* that the search warrant was not supported

---

[5] "Under the 'fruit of the poisonous tree' doctrine, all evidence derived from the exploitation of an illegal search or seizure must be suppressed, unless the Government shows that there was a break in the chain of events sufficient to refute the inference that the evidence was a product of the Fourth Amendment violation." *United States v. Rivas*, 157 F.3d 364, 368 (5th Cir. 1998).

8

by probable cause, the police acted in good faith, rendering suppression inappropriate pursuant to *United States v. Leon*, 468 U.S. 897 (1984). *See id*. at 10; *United States v. Crosby,* 106 F. Supp.2d 53, 58 (D. Me. 2000), *aff'd*, 24 Fed. Appx. 7 (1st Cir. 2001) (pursuant to *Leon*, "[e]vidence seized in violation of the Fourth Amendment is admissible in court if the government placed an objectively reasonable reliance on a neutral and detached magistrate judge's incorrect probable cause determination") (citation and internal quotation marks omitted).

In his brief, *see* Motion To Suppress at [4], and during oral argument, defense counsel invoked an exclusion to *Leon* applicable when an "affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable[,]" *United States v. Owens*, 167 F.3d 739, 745 (1st Cir. 1999) (citation and internal quotation marks omitted).

The government bears the burden of proving the lawfulness of warrantless searches and seizures. *See, e.g., United States v. Ramos-Morales*, 981 F.2d 625, 628 (1st Cir. 1992). A defendant bears the burden of proving the illegality of a warrant; if he succeeds, the burden shifts to the government to prove entitlement to the *Leon* good-faith exception. *See, e.g., United States v. Longmire*, 761 F.2d 411, 417 (7th Cir. 1985) ("The general federal rule on who bears the burden of proof with respect to an allegedly illegal search or seizure is based upon the warrant-no warrant dichotomy: If the search or seizure was effected pursuant to a warrant, the defendant bears the burden of proving its illegality; if the police acted without a warrant, the prosecution bears the burden of establishing legality."); *see also, e.g., United States v. Koerth*, 312 F.3d 862, 868 (7th Cir. 2002) ("If a defendant is successful in establishing the invalidity of the search warrant, the burden then shifts to the Government to establish that the police relied in good faith on the judge's decision to accept the affidavit and issue the warrant."). "An officer's decision to obtain a warrant is *prima facie* evidence that he or she was acting in good faith." *Id*. The

defendant bears the burden of rebutting the government's good-faith showing by demonstrating that one or more of the *Leon* exclusions applies. *See, e.g., id.*[6]

For the reasons that follow, I conclude that the government meets its burden of demonstrating that the traffic stop and the defendant's arrest were lawful, and the defendant fails to meet his burden of demonstrating that the warrant was unlawful. Even assuming *arguendo* that the warrant was unlawful, the government meets its burden of proving entitlement to the *Leon* good-faith exception, and the defendant falls short of showing that the *Leon* exclusion upon which he relies properly is applied.

### A. Traffic Stop

The First Circuit has observed:

> In *Terry v. Ohio,* [392 U.S. 1 (1968)], the Supreme Court first recognized that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest. This authority permits officers to stop and briefly detain a person for investigative purposes, and diligently pursue a means of investigation likely to confirm or dispel their suspicions quickly.

*United States v. Trueber,* 238 F.3d 79, 91-92 (1st Cir. 2001) (citations and internal punctuation omitted).

The validity of an investigative *Terry* stop hinges on "whether the officer's actions were justified at their inception, and if so, whether the actions undertaken by the officers following the stop were reasonably responsive to the circumstances justifying the stop in the first place as augmented by information gleaned by the officers during the stop." *Id*. at 92 (citations and

---

[6] "There are four exclusions to the *Leon* good-faith exception: (1) when the magistrate was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard for the truth; (2) where the issuing magistrate wholly abandoned his detached and neutral judicial role; (3) where the affidavit is so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable; and (4) where a warrant is so facially deficient – i.e. in failing to particularize the place to be searched or the things to be seized – that the executing officers cannot reasonably presume it to be valid." *Owens*, 167 F.3d at 745 (citation and internal punctuation omitted).

internal punctuation omitted). An "objective reasonableness standard" governs. *United States v. Moore*, 235 F.3d 700, 703 (1st Cir. 2000).

"The first part of the [*Terry*] inquiry is satisfied if the officers can point to specific and articulable facts which, taken together with rational inferences derived from those facts, reasonably show that an investigatory stop was warranted." *United States v. Maguire*, 359 F.3d 71, 76 (1st Cir. 2004). "To withstand scrutiny [in the context of a *Terry* stop], an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." *Id*. (citations and internal quotation marks omitted).

At oral argument, defense counsel contended while Cejka may have had "articulable" suspicion that the minivan contained a blue light, he lacked "reasonable" suspicion that it did. He argued that:

1. Cejka's concealment that his daughter was his passenger on the day in question compromised his credibility.

2. The presence of the bored daughter as a passenger clouded Cejka's judgment, prompting him to pull over the defendant's minivan despite his own contemporaneous self-professed doubts as to whether he had seen a blue light.

3. Cejka could not reasonably have concluded that the small blue GPS suction cup, which was rubbery and not luminescent, was a blue light. He made no effort to confirm whether it was by pulling alongside the minivan as it traveled northbound on I-295. He also made no effort to ascertain whether any blue light was subject to an exception, with which he appeared unfamiliar, for auxiliary interior blue lights, which is applicable so long as they are no higher than 42 inches and are not visible more than 20 feet from the vehicle.

4. In any event, once Cejka dispelled his suspicion that the minivan contained a blue light, he should have ended the stop and permitted the defendant to go on his way.

At oral argument, the government's counsel rejoined that:

1. Cejka possessed reasonable, articulable suspicion, based on his view of the minivan as it passed him by, that it contained an illegal blue light.

2. Cejka was not required to place his own or other drivers' safety at risk by driving alongside the minivan to confirm or dispel that suspicion.

3. Cejka was indeed familiar with the exception for blue auxiliary lights, and concluded that it did not apply.

4. It defies common sense to suggest that Cejka manufactured the minivan stop for the entertainment of his daughter.

5. As soon as Cejka dispelled his suspicion that the minivan contained a blue light, he observed a different infraction, the playing of a movie while driving. For purposes of ticketing the defendant for that infraction, he reasonably asked for identifying information, a process that culminated in the defendant's arrest for driving without a license.

The government meets its burden of demonstrating that Cejka's stop of the defendant's vehicle was lawful. Maine law provides that, with certain exceptions, "a vehicle may not be equipped with or display a blue light." 29-A M.R.S.A. § 2054(2)(D). Among those exceptions: "Blue interior auxiliary lighting or dash lighting may be used on any vehicle if no portion of the beam of light is visible at a height of 42 inches above a surface parallel with the level surface on which the vehicle stands at a distance of 20 feet from any part of the vehicle." *Id.* § 2054(2)(D)(4). An "auxiliary light" is "a light, other than standard equipment lighting such as headlights, taillights, directional signals, brake lights, clearance lights, parking lights and license

plate lights, that is displayed on a vehicle and used to increase the operator's visibility of the road or the visibility of the vehicle to other operators and pedestrians." *Id*. § 2054(1)(C).

Cejka reasonably suspected, based on the combination of the bright blue suction cup, the blue and white placard hanging from the rear-view mirror directly above it, and the chrome encasing the back of the rear-view mirror and glinting in the sunlight as the minivan passed him, that the minivan contained an illegal blue light.[7] Assuming *arguendo* that the suspected blue light might have qualified for the "auxiliary lighting" exception, it is difficult to see how Cejka could have determined, without stopping the minivan, that any blue light emanating therefrom did or did not meet the specified height and distance requirements. Of course, once Cejka stopped the minivan and determined that it contained no blue light, he had no reason to concern himself with the "auxiliary lighting" exception.

That Cejka's suspicion was objectively reasonable is dispositive: it does not matter whether he was motivated to make the stop to please or entertain his daughter. *See, e.g., United States v. Coplin*, 463 F.3d 96, 104 (1st Cir. 2006) ("To the extent that the defense counsel sought to inquire about Officer Rioux's subjective beliefs, the responses that the cross-examination was designed to elicit were not especially probative of the basis for the stop (which, after all, depended on objective reasonableness, not on subjective impressions).") (citation omitted). In any event, I do not credit defense counsel's speculation concerning Cejka's motivation. The videotape of the event reveals that, just prior to the stop in question, Cejka stopped two vehicles for speeding and chose to issue warnings rather than tickets. This tends to undercut the suggestion that he was aggressively enforcing the law for his daughter's entertainment. Further,

---

[7] The chrome backing of the rear-view mirror and the bright-blue color of the suction cup are particularly apparent in a photograph taken by police after the impoundment of the defendant's vehicle. *See* Gov't Exh. 2. However, even the defendant's photographs, taken at a different time and in a different location, reveal the bright blue color of the suction cup. *See* Dft's Exhs. 1-6.

13

as counsel for the government argued, it defies common sense to suggest that a stop for suspected possession of a blue light is the sort of stop that would be manufactured for entertainment value.

Because Cejka possessed reasonable, articulable suspicion that the minivan contained an illegal blue light, he was permitted to make a *Terry* stop to confirm or dispel that suspicion. The defendant cites no authority for the proposition that Cejka had a further obligation to pull alongside his minivan to get a better view of the suspected blue light, and I know of none. The manner in which Cejka chose to confirm or dispel his suspicions – by pulling the minivan over to the breakdown lane – was reasonable in the circumstances. Cejka suggested, and common sense supports, that an attempt to peer into a minivan while traveling at highway speeds potentially could have endangered himself or other motorists.

Beyond this, Cejka acquired additional reason to effectuate a *Terry* stop as he attempted to pull the minivan over. The stop took considerably longer to effectuate than was normal in Cejka's experience. As Cejka closely followed the minivan, flashing his blue lights and sounding his siren, he observed the defendant repeatedly reaching to his right and right rear, causing the minivan to drift to the left, and tapping his brakes. Cejka reasonably viewed this activity as raising suspicion of an attempt to hide contraband prior to the traffic stop. He was permitted under *Terry* to further investigate that conduct, as well, and indeed immediately did so upon reaching the driver's side of the minivan following the stop.

While Cejka quickly observed that the minivan in fact contained no blue light, he also saw what he understood to be a separate traffic infraction, driving while viewing a movie.[8] He

---

[8] Insofar as it appears, Cejka referred to 29-A M.R.S.A. § 2118, pertaining to failure to maintain control of a motor vehicle, which took effect on October 1, 2009. *See* 29-A M.R.S.A. § 2118. Pursuant to that statute, operating a motor vehicle while distracted is not in itself a traffic infraction. *See id.* Something more is required; for example,
*(continued on next page)*

14

asked to see the defendant's driver's license and automobile registration, a routine practice in issuing a ticket. As noted above, driving while distracted (for example, while viewing a movie) is not, standing alone, a traffic infraction. However, even had Cejka not believed he had observed a traffic infraction, he permissibly could have sought to identify the defendant. *See, e.g., Hiibel v. Sixth Judicial Dist. Court of Nev., Humboldt County*, 542 U.S. 177, 185 (2004) ("In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment."). When the defendant was unable to produce either a driver's license or car registration, Cejka reasonably sought to identify him through alternative means. In the process of so doing, as discussed below, he developed probable cause to arrest him for operating a vehicle without a driver's license. At no time did Cejka's conduct exceed the bounds of a reasonable *Terry* stop.

### B. Defendant's Arrest

The First Circuit has stated:

> Probable cause exists when police officers, relying on reasonably trustworthy facts and circumstances, have information upon which a reasonably prudent person would believe the suspect had committed or was committing a crime. The inquiry into probable cause focuses on what the officer knew at the time of the arrest, and should evaluate the totality of the circumstances. Probable cause is a common sense, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.

*United States v. Vongkaysone*, 434 F.3d 68, 73-74 (1st Cir. 2006) (citations and internal punctuation omitted). An officer's determination that a crime has been committed need not be "ironclad" or even "highly probable"; it need only have been "reasonable" to satisfy the standard of probable cause. *United States v. Winchenbach*, 197 F.3d 548, 555-56 (1st Cir. 1999); *see*

---

the simultaneous commission of a traffic infraction or of the crime of driving to endanger. *See, e.g., id.* § 2118(2)(A). Thus, Cejka was mistaken in his belief that watching a movie and thus driving while distracted is, in itself, a traffic infraction. Nonetheless, as discussed below, his mistake is not outcome-determinative.

15

*also, e.g., Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 255 (1st Cir. 1996) ("[O]ne who asserts the existence of probable cause is not a guarantor either of the accuracy of the information upon which he has reasonably relied or of the ultimate conclusion that he reasonably drew therefrom.").

Cejka arrested the defendant for operating without a license. Pursuant to 29-A M.R.S.A. § 1251, it is a Class E crime to operate a motor vehicle on a public way or parking area without being licensed. *See* 29-A M.R.S.A. § 1251(1)(A).

At oral argument, defense counsel maintained that the defendant did not admit that he had no license, but rather made an ambiguous statement that he did not have a Maine license but had an Arizona license. He suggested that Cejka performed an insufficient search to form probable cause for the arrest, having checked only the Maine DMV database, which would not disclose whether a driver was licensed in another state. He added that Cejka's consultation with a sergeant about what he should do bears out the speculative character of the basis of the arrest and, hence, its unlawfulness.

As the government's counsel rejoined, Cejka indeed had probable cause to arrest the defendant for operating without a license. The defendant was unable to produce evidence of a license. Cejka was unable to verify that he was a licensed Maine driver, although he stated that he was a Maine resident. The defendant ultimately admitted to Cejka that he did not have, and never had had, a Maine driver's license. When Cejka asked whether he was licensed in another state, he admitted that he had only been licensed in Arizona, and only as a juvenile. His admissions regarding those points were unambiguous. Cejka's inability to verify that the defendant possessed a valid Maine driver's license, coupled with the defendant's admission that

he had no valid license from any state, conferred probable cause to arrest him for operating a motor vehicle without a license.

### C.  Search of Van Pursuant to Warrant

"A warrant application must demonstrate probable cause to believe that (1) a crime has been committed – the 'commission' element, and (2) enumerated evidence of the offense will be found at the place to be searched – the so-called 'nexus' element." *United States v. Ribeiro*, 397 F.3d 43, 48 (1st Cir. 2005) (citation and internal quotation marks omitted). "In determining whether the nexus element is satisfied, a magistrate has to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Id*. at 48-49 (citation and internal punctuation omitted). "Put differently, the application must give someone of 'reasonable caution' reason to believe that evidence of a crime will be found at the place to be searched." *Id*. at 49.

Both the issuing magistrate and a subsequent reviewing court look to "the totality of the circumstances indicated [within the four corners of] a supporting affidavit" to assess the existence *vel non* of probable cause, "[y]et such review cannot start from scratch." *United States v. Schaefer*, 87 F.3d 562, 565 (1st Cir. 1996) (citation and internal quotation marks omitted). "A reviewing court must give great deference to a magistrate's assessment of the facts and inferences supporting the affidavit . . ., reversing only if there is no substantial basis for concluding that probable cause existed." *United States v. Sawyer,* 144 F.3d 191, 193 (1st Cir. 1998), *abrogated on other grounds, United States v. Giggey*, 551 F.3d 27 (1st Cir. 2008) (citation and internal punctuation omitted).

At oral argument, defense counsel contended that the Cejka affidavit failed to convey probable cause because it failed to convey a fair probability that a *specific* item would be found in the minivan. Instead, defense counsel argued, Cejka merely conveyed his hunch that contraband of an unspecified nature would be found therein. Defense counsel reasoned that Cejka, who had no idea of what he might actually find, sought permission to engage in a fishing expedition. Defense counsel further argued that the basis for Cejka's hunch, namely, the defendant's movements prior to the stop, did not supply probable cause for the search because those movements were entirely consistent with the defendant's explanation that he was searching for his cell phone and then phoning his wife.

Counsel for the government countered that the totality of the circumstances, including Cejka's reasonable disbelief of the defendant's explanation for his movements, the defendant's nervousness when stopped, and his provision of false identifying information, supplied probable cause to believe that contraband was present in the van. In any event, she contended, even assuming *arguendo* that probable cause was lacking, the *Leon* good-faith exception applies. Defense counsel disputed *Leon*'s applicability, invoking the exclusion that pertains when, despite the court's issuance of a warrant, no reasonable officer could have thought that probable cause existed.

I find no substantial basis to conclude that the Cejka affidavit failed to convey probable cause to search the defendant's minivan. The defendant errs in arguing that Cejka was required to supply probable cause to believe that a *specific type* of contraband was present in the minivan. Cejka need only have supplied probable cause to believe that *contraband* was present there. *See, e.g., United States v. Martinez-Cortes*, 566 F.3d 767, 771 (8th Cir. 2009) (when occupants of vehicle did not promptly comply with orders to put the vehicle in park and show their hands, and

18

defendant moved his arms as if to hide something between his leg and the car's console, officers had probable cause to believe that criminal activity was afoot and were justified in searching those areas of the vehicle where weapons or contraband might be hidden). Cejka's affidavit supplied that probable cause, based on his averments that:

1. The minivan failed to stop when he was directly behind it with his blue lights activated, traveling approximately a half mile before stopping. *See* Affidavit ¶ 2.

2. During that time, the minivan's operator made numerous furtive movements by bending to his right and bending to his right rear. *See id.* Based on Cejka's training and experience, furtive movements indicate that a person is attempting to hide or conceal items to prevent their discovery by law enforcement. *See id.* ¶¶ 2, 10.

3. The driver could not produce a driver's license and gave an identity that later was ascertained to be false. *See id.* ¶¶ 4, 8-9. When his identity was verified, jail personnel told Cejka that the defendant had outstanding felony warrants in New Mexico for kidnapping, conspiracy, and identity theft. *See id.* ¶ 9.

Furtive movements during traffic stops have been found to convey probable cause to search a vehicle for contraband. *See, e.g., Martinez-Cortes*, 566 F.3d at 771; *United States v. Bullock*, No. 08-CR-194, 2009 WL 1770120, at *3-*4 (E.D. Wis. June 23, 2009) (officers had probable cause to search vehicle's center console for contraband when defendant failed to immediately pull over in response to the officers' signal, slowing but continuing on for about a block, during which time officers observed him lean to the left, as if withdrawing something from his waistband or pocket, then lean to the right, as if to stash something in the center console area, and both officers concluded, based on their training and experience, that these movements were consistent with the driver trying to conceal a firearm). The movements observed by Cejka

conveyed probable cause to believe that the defendant had hidden contraband to prevent its discovery by the police. The defendant's provision to Cejka of a false identity, and his criminal record, strengthened that inference.[9]

In any event, even assuming *arguendo* that the Cejka affidavit failed to convey probable cause for issuance of the warrant, it supplied sufficient indicia of probable cause "to render official belief in its existence" reasonable. *Leon*, 486 U.S. at 923.

### III. Conclusion

For the foregoing reasons, I recommend that the Motion To Suppress be **DENIED**.

### *NOTICE*

*A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. § 636(b)(1)(B) for which <u>de novo</u> review by the district court is sought, together with a supporting memorandum and request for oral argument before the district judge, if any is sought, within fourteen (14) days after being served with a copy thereof. A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.*

*Failure to file a timely objection shall constitute a waiver of the right to <u>de novo</u> review by the district court and to appeal the district court's order.*

Dated this 27th day of August, 2010.

/s/ John H. Rich III
John H. Rich III
United States Magistrate Judge

---

[9] Cejka did not set forth, in his affidavit, the defendant's explanation for his movements or Cejka's reasons for disbelieving it. It, therefore, does not factor into the question of whether the search warrant was supported by probable cause. In any event, Cejka supportably discounted the defendant's explanation.